691 A.2d 676

**The UNIVERSITY OF MARYLAND**

v.

**MFE INCORPORATED/ NCP ARCHITECTS, INCORPORATED.**

**No. 24, Sept.Term, 1996.**

Court of Appeals of Maryland.

March 10, 1997.

Reconsideration Denied May 2, 1997.

Mark S. Dachille, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Jay N. Bernstein, Assistant Attorney General, on brief), Baltimore, for Petitioner.

Nevett Steele, Jr. (Michael J. Gentile, Nevett Steele, Jr., P.A., on brief), Towson, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

This appeal concerns a dispute between the University of Maryland and a joint venture of architects (which we shall hereafter refer to, collectively, as MFE) arising out of a procurement contract for architectural services. We granted

*certiorari* to consider the narrow question of whether delivery to MFE of the procurement officer's final decision by facsimile transmission (FAX) sufficed to commence the 30-day period allowed for filing an appeal to the State Board of Contract Appeals (BCA). In the course of our research on that issue, however, we discovered a more significant problem: the BCA had no subject matter jurisdiction over the claim.

## BACKGROUND

The relevant facts are undisputed. In September, 1981, the parties entered into a contract calling for MFE to provide plans and specifications for the renovation and expansion of the McKeldin Library on the University's College Park campus. On May 4, 1993—nearly 12 years later and after completion of the construction based on those plans and specifications—the University gave written notice to MFE that it was asserting a claim in the amount of $2,470,792 for certain delay and additional construction costs allegedly incurred by the University as the result of errors and omissions in MFE's designs. Insofar as we can tell from the record, the University was not then holding any money owing to MFE under the contract. It was not attempting, therefore, to set off its claim against funds otherwise due to MFE but rather was seeking to have MFE affirmatively pay the amount of the claim to the University. The letter informed MFE that it could file a response within 30 days.

By letter dated June 4, 1993—the thirty-first day, as we count it—MFE, through its attorney, filed a response denying liability.[1] The attorney sent the response to the University "Via Facsimile and Overnight Mail" on her law firm's stationery, which included the firm's FAX number.

By letter dated October 28, 1993, addressed to the attorney, the Director of the University's Department of Procurement and Supply informed MFE that the State was entitled to

---

1. The University's letter of May 4 was sent separately to each of the joint venturers, MFE, Incorporated and NCP, Incorporated. The attorney's response was a single one on behalf of the joint venture.

indemnification for costs aggregating $2,043,735 due to MFE's design errors and omissions. The letter stated that it constituted the final action of the procurement officer and that the decision could be appealed to the BCA in accordance with Code of Maryland Regulations (COMAR) 21.10.04.06. The letter concluded with the statement, "If you decide to take such an appeal, you must mail or otherwise file a written notice of appeal with the Appeals Board within 30 days from the date you receive this decision."

The 15–page letter was sent to the attorney by FAX transmission from the Contract Litigation Unit of the Attorney General's Office on October 29, 1993. The transmission produced a Transmission Result Report showing, among other things, a date of October 29, 1993, a time of 11:25 a.m., 15 pages, and a "Result" of "OK." After the transmission was completed, a secretary in that unit called the attorney's office and was informed by someone named Tina that the FAXed document had been received. She then wrote on the Transmission Result Report: "Called 10/29/93—11:35 a.m.—spoke to Tina. It was received."

Not content to rely solely upon the FAX transmission, the Assistant Attorney General also sent a copy of the decision to the attorney by Federal Express on October 29. On December 8, 1993, upon a tracer request, one Deborah Constable, listed by Federal Express as being with the State Department of Transportation but identified otherwise as being a secretary in the Attorney General's office, was informed by Federal Express that its records showed that the document was delivered to an L. Garett on November 1, 1993. The identity of Mr. or Ms. Garett is not revealed in the record before us, but it is undisputed that the document was, in fact, delivered to someone in the attorney's office on November 1. That document, being a copy of the one FAXed on October 29, also ended with the statement that it constituted the final action of the procurement officer, that it could be appealed to the BCA in accordance with COMAR 21.10.04.06, and that, to take such an appeal, it was necessary to file a written notice with the BCA within 30 days "from the date you receive this decision."

On November 29, 1993, the attorney sent a notice of appeal to the BCA. The notice was sent by first class mail and was received by the BCA on November 30. On December 30, the University moved to dismiss the appeal on the ground that it was untimely. The University argued that the time for appeal commenced to run on October 29, when the Director's final decision was transmitted to the attorney by FAX, and that the time elapsed on November 28.

The BCA agreed with the University and dismissed the appeal. It noted that the pertinent COMAR regulation (21.10.04.04D) requires that the procurement agency's final decision be "furnished to the contractor by certified mail, return receipt requested, or by any other method that provides evidence of receipt" and held that the FAX transmission in this instance constituted a method that provided evidence of receipt. It observed that the record left no doubt that MFE had actual possession of the final decision on October 29 and that transmission of copies by FAX "has become an everyday event in the ordinary course of business" and was "accurate, reliable and meets all of the substantive tests as a method of furnishing the final decision to the contractor."

Both the Code and COMAR require that an appeal from a final agency decision denying a contract claim be filed within 30 days after receipt of the notice of final action. Rejecting MFE's claim that the appeal should be regarded as having been filed when the notice was dropped in the mailbox on November 28, the BCA held that the appeal was actually filed on November 30 and was therefore two days late. On March 7, 1994, the BCA dismissed the appeal for lack of jurisdiction. It confirmed that ruling on June 30, when it denied MFE's motion for reconsideration.

The Circuit Court for Baltimore County, on judicial review, reversed the BCA ruling, holding that the combination of FAX and telephone follow-up did not suffice to constitute a furnishing of the final agency decision by "any other method that provides evidence of receipt," as required by COMAR 21.10.04.04D. The court concluded that the regulation did not

contemplate delivery by FAX because that method of transmission was not used when the regulation was adopted.

## DISCUSSION

State procurement is governed by statute and regulation, and we therefore turned to them to determine whether the transmission of a final agency procurement decision by FAX suffices to commence the time for noting an appeal to the BCA. To our surprise—and no doubt to the surprise of the parties, as neither of them has raised the issue—we discovered that the administrative BCA procedure created by statute does not apply to a claim such as this one—an attempt by a State agency to force a former contractor to pay over money not then being held by the agency under the contract.

The statutes are contained in Maryland Code (1995 Repl. Vol.), State Finance and Procurement article, titles 11 through 17. Section 12–101 of that article vests general control over procurement in the Board of Public Works which, among other things, may set policy, adopt regulations, and establish internal operating procedures. In accordance with that authority, the Board has adopted a set of procurement regulations; they are found in COMAR, title 21.

Title 15, subtitle 2 of the State Finance and Procurement article (§§ 15–201 through 15–223) sets forth a statutory framework for the resolution of procurement contract disputes. Those statutes deal with two kinds of disputes: (1) "contract claims," which are defined in § 15–215(b) as claims that relate to a procurement contract, including claims about the performance or breach of the contract, and (2) "protests," which are defined in § 15–215(c) as complaints relating to the *formation* of a procurement contract. This case, of course, involves a contract claim, not a protest.

Section 15–217, captioned "Initiation of protest or contract claim," permits a bidder, prospective bidder, offeror, or prospective offeror to submit a protest. It allows only a "person who has been awarded a procurement contract" to file a contract claim. There is no provision in § 15–217 or, to our

knowledge, in any other part of the subtitle, permitting the State unit to file either a protest or a contract claim. It is not surprising that the law makes no reference to a State unit filing a protest, as there would ordinarily be no occasion for the unit to do so; it awards the contract. As we shall see, however, the omission to authorize contract claims by a State unit is significant, for both the Model Procurement Code developed by the American Bar Association, which was, in fact, used as a guide in the development of the Maryland procurement law, and the Federal Contract Disputes Act, which had been enacted and was available for use as a guide, provide for contract claims by governmental units.

Section 15–217 commences the chronology of the administrative dispute resolution process. Section 15–218 sets forth the duties of the procurement officer when he or she receives a contract claim, *i.e.*, to review the claim, make a decision on it, and send the decision to the reviewing authority. The reviewing authority may then approve, disapprove, or modify the decision of the procurement officer. Section 15–219 deals specifically with contracts for construction. That section also is written with particular reference to contract claims by contractors, not by the State. Section 15–220 permits a contractor to appeal the final action of a unit to the BCA within 30 days after receipt of the notice of a final action.

Section 15–221 sets forth procedures to be used by the BCA in adjudicating the appeal. Section 15–222 allows the BCA to award interest on money that it determines is due to the *contractor* under a contract claim. There is no provision for interest on money found to be due to the State. Finally, § 15–223 provides that a decision of the BCA is subject to judicial review in accordance with the Administrative Procedure Act (Md.Code, State Government article, title 10, subtitle 2). Any party to the BCA decision, including the governmental unit, may seek such review.

This whole statutory structure is established to deal with protests and contract claims, and, as we have noted, only a contractor—a "person who has been awarded a procurement

contract"—is authorized to file a contract claim. § 15–217(a)(2). There is no statutory basis of BCA jurisdiction over a claim filed by anyone else, including the State unit. The legislative history of the procurement law indicates that that limitation was not inadvertent.

The practical origin of the current State procurement law was House Joint Resolution 19, adopted in the 1977 Session of the General Assembly. That Resolution, calling attention to the numerous bills that had been introduced dealing with purchasing and procurement, the various National and State groups and committees studying various aspects of State procurement policy, the fact that the American Bar Association had released for study a Model Procurement Code for State and Local Governments, and the need to establish a coordinated purchasing and procurement system, created a Purchasing and Procurement Policies Task Force (PPPTF). The stated objective of the PPPTF was to bring greater coordination, simplicity, and uniformity to State purchasing and procurement processes, to consolidate and integrate the existing diverse laws and regulations, and to recommend which processes should be in the law and which should be in regulations. The Task Force was to report by December, 1977.

The PPPTF made its first report in October, 1977, attaching a Preliminary Working Draft No. 1 of a comprehensive procurement statute. It noted that the draft was a tentative one and was based on proposals embodied in the Preliminary Working Paper No. 2, issued in June, 1977, by a Coordinating Committee of the ABA working on the development of a Model Procurement Code for State and Local Governments.

The preliminary ABA Coordinating Committee proposal placed initial responsibility for resolving contract disputes on the purchasing officer or agency. Section 9–201 authorized that officer or the head of the unit to settle, pay, or adjust any "claim *by or against,* or controversy with, a contractor relating to a contract entered into by the [State]." (Emphasis added.)

Section 9–202 directed the officer or unit to make, in writing, a final agency decision on the claim.

The purchasing officer's decision was binding on the unit. The contractor, however, was given the right to sue in court and, pursuant to an optional provision providing for a BCA, to appeal to that board. *See* §§ 9–202, 9–301, and 9–401—9–404. It is clear from this draft that, although only the contractor could appeal from the purchasing officer's decision, all claims arising from the contract—those initiated by the contractor and those initiated by the unit—were subject to the dispute resolution process.

The PPPTF preliminary working draft did not include any provision for a BCA. It called for protests over the award of procurement contracts to be resolved by the purchasing officer or the head of the purchasing agency, with the right of a bidder, prospective bidder, or offeror to appeal that decision to the circuit court. The only provision relating to contract claims was in proposed § 8–101, which directed that, "[p]rior to the institution of any action in a court concerning any contract, claim, or controversy," the purchasing officer or the purchasing agency was authorized, subject to budgetary limitations or conditions imposed by regulation, to settle, compromise, pay, or otherwise adjust "the claim by or against, or controversy with, a contractor" relating to a contract, including a claim or controversy based on breach of contract, mistake, misrepresentation, or other cause for contract modification or rescission. Presumably, if any such claim, for or against a contractor, was not resolved at that level, either party could go to court.

In February, 1978, the PPPTF filed what it thought was its final report, enclosing a second draft of a procurement law. That draft was introduced into the 1978 Session as SB 748 and HB 1236. As introduced, it created an Office of State Procurement within the Department of General Services, to be headed by a Chief Procurement Coordinator. That Coordinator, rather than an agency purchasing officer, was authorized to compromise, pay, or adjust "a claim or controversy relating

to a contract entered into by the State. . . ." There was no provision in the bills for a BCA or any other administrative procedure beyond the authority of the Coordinator. Presumably, therefore, if a claim by either the unit or the contractor was not resolved by the Coordinator, either party could file an action in court.

The House Bill was not acted upon. The Senate passed the Senate Bill, but with substantial amendments to the dispute resolution provisions. Those amendments provided for initial resolution of contract disputes by the agency procurement officer, with the right of "a person aggrieved" by the final action of the agency to appeal to a BCA, which would have been created under the amendments. Significantly, however, this process was commenced by a "timely demand," which, in the case of contract disputes, could be made only by a "contractor." The language substituted by the Senate, in proposed § 8–201, was "[u]pon timely demand . . . by a prospective bidder, bidder or contractor. . . ."

That language was apparently taken from the final version of the ABA Model Code. Unfortunately, the Senate did not read the Model Code carefully. The language in question was used in § 9–101 of the Model Code with respect to *bid protests*, not contract claims. Section 9–103 of the Model Code, dealing with contract claims, extended to "controversies between the [State] and a contractor and which arise under, or by virtue of, a contract between them" and did not indicate who could, or could not, file a claim or demand. The administrative process provided for in the Model Code encompassed any such "controversy" and was therefore not limited to claims filed by a contractor.

By apparently lifting and substituting the limiting language used by the ABA with respect to bid protests and applying it to contract claims as well, the Senate framed the bill, for the first time, to exclude contract claims made by State units. The bill died in the House Appropriations Committee late in the Session.

A more limited procurement law did pass in the 1978 Session. 1978 Md. Laws, ch. 418 created a BCA for the Department of Transportation and gave it jurisdiction over "all disputes other than labor disputes arising under a contract with the department, or as a result of a breach of a contract with the department." Consistently with the approach taken in the PPPTF proposal, that language was broad enough to include contract claims by either party. Indeed, testimony offered on behalf of the Department of Transportation on the bill (HB 922), apparently by the Secretary, made clear that the BCA "will hear and decide *all* contract disputes between the Department and private contractors."[2] (Emphasis added.)

In October, 1978, the PPPTF presented for comment a Working Draft No. 3, which was essentially SB 748 from the 1978 Session, as it had been amended by the Senate. Notwithstanding the broader approach just taken with respect to the Department of Transportation, the dispute resolution provisions, as to both bid protests and contract claims, continued to hinge on a "timely demand" by a "prospective bidder or offeror, bidder or offeror, or contractor." A version of that bill was introduced into the 1979 Session as SB 659. Tellingly, that limitation produced a letter from the Assistant Attorney General representing the Department of General Services to counsel for the House Constitutional and Administrative Law Committee, with copies to the Senator who chaired the PPPTF, the Governor's Office, the Deputy Secretary of the Department of General Services, and the Deputy Attorney General, calling specific attention to the fact that the bill did

---

**2.** The written testimony placed in the bill file did not identify the witness, although it was stated to be on behalf of the Department of Transportation. The list of witnesses appearing at the hearing identifies only one person from the Department—the Secretary, Herman Intemann.

As introduced, the bill exempted BCA proceedings from the Administrative Procedure Act, and it therefore contained a provision allowing judicial review of BCA decisions in the Circuit Court for Anne Arundel County. During the legislative process, however, the exemption and the special provisions for judicial review were stricken.

not allow for contract claims by the State. The letter stated, in relevant part:

"I wish to bring to your attention a problem I perceive in Title Seven of Senate Bill 659, entitled 'Administrative and Civil Remedies.' This section provides for the administrative settlement of contract claims against the State, and, in the absence of a settlement, a hearing on that dispute before a newly created Maryland State Board of Contract Appeals. *The problem I perceive is that the scope of controversies covered within the settlement and appeal processes is too narrow. There is no provision for including claims by the State against contractors and there is no provision for including claims by the State against third parties (such as architects and engineers) arising out of claims made against the State by a contractor.*"

(Emphasis added.)

The assistant attorney general expressed concern that the failure to include those types of controversies within the ambit of the administrative procedure could lead to litigation in two separate fora, and gave as one example the very kind of case now before us:

"On [a] State construction project, the architect prepares a poor roof design. The contractor, who could have constructed a well designed roof in 40 days, is forced to spend 6 months constructing a roof and waiting for correction of the original improper design. The contractor suffers the delay damage, and files a claim against the State in the Board of Contract Appeals for $300,000.00. The State, recognizing the wisdom of the contractor's claim, wishes to file a third party claim against the architect, alleging that the architect, because of his negligence, is liable for all or part of the sums that the State owes the contractor."

The assistant attorney general further noted that, under the bill as then drafted, the contractor would have to file his claim against the State with the BCA, but that the State "must file its third party claim, arising out of the very same facts, in the appropriate Circuit Court," forcing the State to try the matter

twice and run the risk of inconsistent decisions. To remedy the problem, he suggested two amendments to the bill: amending § 7–201(a) to add the State as "one of the parties entitled to demand a negotiation and settlement of disputes" and adding a new § 7–201(f)(3) permitting the State, in any appeal to the BCA by a contractor, to assert any counterclaim it may have against the contractor and any third-party claim arising out of the facts. He stated that he had shared his concerns with the Department of General Services and the Office of the Attorney General, both of which supported his proposed amendments.

SB 659 was not amended as requested by the assistant attorney general. Nor did it pass. A version of it, containing the same limiting language that was inserted into SB 659, was introduced into the 1980 Session as HB 972, however, and, as to these provisions, was enacted without change. 1980 Md. Laws, ch. 775, enacting a new article 21 to the Maryland Code. Section 7–201 of the new article provided that, upon a timely demand "by a prospective bidder or offeror, bidder or offeror, or contractor," the agency procurement officer, consistent with the budget and all applicable laws and regulations, may resolve disputes "relating to the formation of a contract with the State or a contract which has been entered into by the State." The decision of the procurement officer was to be reviewed by the unit head, who would make the final agency decision, from which the contractor could appeal to the BCA, created under the Act. Proceedings before the BCA were subject to the Administrative Procedure Act, including the right of judicial review.

Following enactment of the 1980 legislation, which repealed and superseded the 1978 statute creating the Department of Transportation BCA, work began on drafting implementing regulations for adoption by the Board of Public Works. By then, the ABA had published recommended regulations to accompany its Model Procurement Code. That Code, as noted, provided in § 9–103 for the resolution of *all* controversies between the State and a contractor arising out of a procurement contract. Implementing that statutory authority, the

recommended regulations addressed claims by a contractor and by the State. Regulation 9–103.05 stated that controversies involving claims asserted by the State against a contractor which cannot be resolved by mutual agreement shall be decided by the appropriate agency procurement officer. Under § 9–505 of the Model Code, the contractor could appeal the procurement officer's decision to the BCA; there was an optional provision allowing the State to appeal if the appeal was taken by, or with the concurrence of, the Attorney General. No implementing regulation was proposed with respect to that section.

As noted, by 1980 Congress had enacted Federal legislation on the resolution of procurement contract disputes, and that legislation also expressly recognized agency claims against a contractor. 41 U.S.C. § 605(a).

Notwithstanding the significant differences in the statutory language, the regulations adopted by the Board of Public Works included, almost verbatim, the ABA recommended regulation 9–103.05 recognizing State claims. COMAR 21.10.04.03 stated that "[a]ll controversies involving claims asserted by the State against a contractor which cannot be resolved by mutual agreement shall be the subject of a decision by the procurement officer." Other parts of the regulation provided that, when a controversy could not be resolved by mutual agreement, the procurement officer, upon written request by the contractor, must make a written decision, which was then to be reviewed by the agency head. The decision of the agency head could then be appealed by the contractor to the BCA.

Although the dispute resolution part of the procurement statute has been amended twice since 1980—in 1986 and 1988—the concerns expressed by the Attorney General's Office with the limiting language were not addressed and, indeed, were exacerbated. The assistant attorney general was concerned over the language in what was then proposed as § 7–201, referring to timely demands by bidders, offerors, and contractors, as simply not including demands by the State.

That language, though restyled, was retained when the procurement statute was substantially rewritten in 1986. *See* 1986 Md. Laws, ch. 840, § 11–137.

The current language, embodied in § 15–217, was enacted in 1988. 1988 Md. Laws, ch. 48. The Legislature split the authorization to file protests from the authorization to file contract claims, exposing even more clearly the fact that no provision was made for the filing of contract claims by the agency; yet it still seemed content to have the law limited in that manner, expressly reserving the right to submit a contract claim to the "person who has been awarded a procurement contract."

Following enactment of the 1988 revision, the COMAR regulations were amended, and the provision for agency claims was expanded. Section 21.10.04.05, adopted by the Board of Public Works pursuant to the authority vested in it by § 12–101(b), extends beyond the implied limitation of § 15–217 and provides for contract claims by both contractors and the government. It does this in two ways. COMAR 21.10.04.05 provides expressly for claims by "a procurement agency." It requires that such claims be asserted by written notice to the contractor explaining the basis and amount of the claim and the time within which the contractor must provide a written response. If the contractor fails to respond or denies the claim or the relief sought, the procurement officer is directed to proceed in the same manner as he or she would with a disputed contract claim by a contractor. In that regard, the regulation specifically references 21.10.04.04B, C, and D.

The second method of providing for claims by a State agency is through a mandatory dispute resolution clause. Here too, however, there is a bit of a gap. Sections 13–218, 13–219, and 13–223 of the State Finance and Procurement article provide for certain mandatory clauses that must be inserted into procurement contracts. A dispute resolution clause is not among them. Nonetheless, COMAR 21.07.01.06 requires all procurement contracts to have one of two alternative dispute resolution clauses. Both provide that the contract

is subject to title 15, subtitle 2 of the State Finance and Procurement article *and* to COMAR 21.10, which, as noted, includes 21.10.04.05. The longer clause defines a claim as a written demand or assertion "by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract." It then parrots somewhat the duties of the procurement officer in resolving the claim.

## *CONCLUSION*

Two things are evident from this history. The first is that the General Assembly gave a great deal of attention to the drafting of the State procurement law. The second is that, notwithstanding that it had the opportunity to provide for subjecting contract claims by a governmental unit to the administrative BCA procedure, notwithstanding that, in the early drafts, it, in fact, provided for the administrative adjustment and resolution of such claims, and notwithstanding that it was specifically warned by the attorney general's office that the change in language inserted in 1978 excluded those kinds of claims, the General Assembly, on three occasions—in 1980, 1986, and 1988—nonetheless proceeded to limit the procedure to contract claims filed by the contractor.

Neither the available legislative history nor the record in this case reveal why the Legislature chose that approach. It may not be the best approach, but it is not a wholly unreasonable one, and certainly not one that would make a plain reading of the statute absurd. Ordinarily, a governmental unit having a claim against a contractor will know of the basis for its claim before it has accepted performance and paid the full amount of the contract price. In that circumstance, all the unit need do is make a claim and inform the contractor that the claim will be set off against funds owing on the contract. The contractor would then make a claim for the disputed amount, which would be subject to the BCA procedure. In most instances, therefore, it is unnecessary to make specific provision for the administrative adjudication of State contract

claims. They can effectively be adjudicated in the context of the contractor's claim.

■ In architectural design contracts, there is more likelihood of the State's claim not arising until after the architect's design work is accepted and full payment is made. The question then is posed: how should the claim be prosecuted? Subjecting it to a BCA procedure is one way, but not the only way. If the BCA rules in favor of the unit and, even after unsuccessful judicial review, the contractor refuses to pay, the State must file suit to recover a judgment. Mere affirmance of a BCA decision under Administrative Procedure Act judicial review does not constitute a money judgment enforceable by attachment or garnishment.

■ The Federal statute covers this eventuality. Section 605(b) of title 41 provides that the contracting officer's decision on a claim is "final and conclusive and not subject to review by any forum, tribunal, or Government agency" unless an appeal is taken to the BCA. If an appeal is taken, the decision of the BCA is also declared to be "final," subject to the contractor's right to appeal to the U.S. Court of Appeals for the Federal Circuit. If, at any of these levels, the Government's claim is sustained, the Government may enforce the claim by bringing suit under the Debt Collection Act of 1982 (31 U.S.C. § 3711 *et seq.*). By virtue of the finality provisions in the Contract Disputes Act, however, the merits of the claim may not be relitigated, and the Government is ordinarily entitled to summary judgment. *United States v. Roarda, Inc.,* 671 F.Supp. 1084, 1085 (D.Md.1987); *United States v. Dabbs,* 608 F.Supp. 507, 509 (S.D.Miss.1985).

Similar finality language was not included in the Maryland statute. Under § 15–218 of the State Finance and Procurement article, the decision of the agency reviewing authority is merely the "final action of the unit." The decision of the BCA is merely "its final decision." § 15–221(e). No broader finality is accorded either decision, as in the Federal statute, an omission that raises the prospect of a relitigation and further supports the view that the Legislature did not intend to

subject governmental unit claims not dischargeable through setoff against funds owing on the contract to the BCA procedure.

If the General Assembly desires to subject these kinds of governmental claims to the BCA process, it is certainly free to do so, and there may be good reason to do so. As we read the current statute, however, it seems clear that it has not yet chosen that approach.[3]

■ That leaves the question of the COMAR regulations. As we indicated, § 12–101(b) gives the Board of Public Works broad authority to adopt procurement regulations. That authority is not unlimited, however, and cannot reasonably be read to empower the Board to adopt regulations that would be inconsistent with the procurement statute or the legislative intent behind it. *See, Fogle v. H & G Restaurant,* 337 Md. 441, 453–55, 654 A.2d 449, 455–56 (1995); *Christ v. Maryland Department of Natural Resources,* 335 Md. 427, 437, 644 A.2d 34, 38 (1994); *Maryland State Police v. Warwick,* 330 Md. 474, 481, 624 A.2d 1238, 1241 (1993).

■ The COMAR regulations recognizing State contract claims can be read in harmony with § 15–217 if they are construed to apply only when, and to the extent, the State is seeking to set off its claim against funds otherwise owing to the contractor under the contract. To give them a broader construction would be to recognize an authority in the Board to provide an exclusive administrative apparatus for a class of cases for which the Legislature considered and rejected such an apparatus, and that, in turn, would raise a number of significant State Constitutional issues. The preferred construction is the one that is in harmony with the statute and does not raise those issues.

■ The BCA dismissed MFE's appeal on the ground that it was untimely. It should have dismissed the appeal because

---

3. We are aware that the BCA has assumed the authority to consider affirmative State contract claims and counterclaims. *See Appeal of Titan Group, Inc.,* MSBCA No. 1135 (Nov. 8, 1983).

it had no subject matter jurisdiction. The circuit court should have affirmed the decision of the BCA on that basis and erred in not doing so. The Court of Special Appeals therefore erred in affirming the judgment of the circuit court.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR REMAND TO CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO VACATE DECISION OF BOARD OF CONTRACT APPEALS AND REMAND CASE TO THAT BOARD WITH FURTHER INSTRUCTIONS TO DISMISS FOR LACK OF JURISDICTION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.