788 A.2d 192

**SEFAC LIFT & EQUIPMENT CORPORATION**

v.

**MASS TRANSIT ADMINISTRATION.**

**No. 51 Sept. Term, 2001.**

Court of Appeals of Maryland.

Jan. 7, 2002.

Paul D. Raschke (H. Dean Bouland, Alan A. Abramowitz, James D. Cathell, Sr. of Bouland & Brush, LLC, on brief), Baltimore, for appellant.

Douglas G. Carrey–Beaver, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

The issue before us is whether the Circuit Court for Baltimore City erred in dismissing a complaint for declaratory and injunctive relief that sought to resolve a procurement dispute between petitioner, FIDAM Corporation (which, in light of its former name, SEFAC Lift & Equipment Corporation, we shall refer to as SEFAC) and the Mass Transit Administration of the State Department of Transportation, now known as the Maryland Transit Administration (MTA). The dispute arose, ultimately, from MTA's termination of its contract with SE-FAC for default. Aggrieved by that termination, SEFAC filed this action in the Circuit Court and also took an appeal to the Maryland Board of Contract Appeals (BCA), notwithstanding its view that BCA has no jurisdiction in the matter.

The administrative appeal is still before BCA, although proceedings on it were stayed pending resolution of the judicial action. As noted, the court dismissed the action, and SEFAC appealed. We granted *certiorari* prior to proceedings in the Court of Special Appeals and shall affirm the judgment of the Circuit Court.

### BACKGROUND [1]

In 1994, SEFAC was awarded a contract by MTA to design and install at MTA's Wabash Rail Shop an electro-mechanical car hoist system capable of raising, supporting, and lowering a "married pair" of Metro rail cars. Completion of the work was required within 240 days—by April 9, 1995. The work fell seriously behind, however, and various deficiencies were discovered in the work that *was* completed. In April, 1997, MTA rejected the lift and gave SEFAC 30 days to cure the problems. The deficiencies were not corrected to MTA's satisfaction, and, on May 14, 1997, MTA again rejected the lift and terminated the contract for default. The parties then entered into negotiations, the result of which was a Forbearance Agreement, signed in September, 1997, in which it was agreed that (1) MTA would withdraw its termination and forbear further termination until December 31, 1997, (2) if SEFAC did not provide a hoist system in conformance with the contract by that time, MTA, without prior notice, could terminate for default SEFAC's right to proceed with performance, and (3) if a hoist system was accepted by MTA prior to the end of the forbearance period, or any extension thereof, MTA would release to SEFAC all outstanding payments due under the contract, including any retainage, less liquidated damages in the amount of $169,750.

The forbearance period was extended to January 30, 1998, at which time the lift performed successfully, but several "punch list" items were found to be in need of correction. MTA did, however, begin using the lift in its maintenance

---

1. Although the complaint was dismissed on the procedural ground that SEFAC had failed to exhaust its administrative remedy before BCA, the record contains a number of documents describing the background and history of the dispute. That history is important in framing and resolving the legal issue. We have gleaned most of the background information from MTA's letter to SEFAC of March 6, 2001, which constituted MTA's final agency action. Some of the statements in that letter are disputed by SEFAC, and we have noted the general nature of the dispute. The underlying facts have yet to be determined, of course, and, accordingly, our background recitation is not to be taken as established fact, but only what the record currently before us indicates.

operations. After several months of such use, additional problems surfaced. Between June 2 and July 20, 1998, the lift failed to move synchronously, stopped, or failed to move at all on six occasions. On August 28, a mechanical fuse broke, rendering the lift inoperable. While testing the lift, SEFAC discovered that one of the central gearboxes was defective. On September 21, 1998, MTA directed SEFAC to prepare a report on the breakage problems that was to contain SEFAC's "root cause analysis" and an outline of recommended corrective measures. On October 13, having not received the report, MTA informed SEFAC that it had until October 30, 1998, to cure the deficiencies and render a report.

In response to the cure notice, SEFAC proposed a number of repairs, but it still failed to render the requested engineering report. In the absence of that report, identifying the "root cause" of the continuing fuse breakage, MTA, with SEFAC's concurrence, sent two of the lifting assemblies to an independent laboratory for inspection and testing. The result of that inspection revealed a number of other defects that, on March 23, 1999, MTA directed SEFAC to correct. In response, SEFAC performed additional work and appeared to correct the problems. On July 22, 1999, SEFAC successfully tested the lift, and the parties agreed that, if the lift continued to operate successfully during a "shakedown" period ending August 21, 1999, MTA would accept it. Because of a minor problem that surfaced during the "shakedown" period, the period was extended to September 16, 1999, at which time MTA accepted the lift.

Within a few weeks after the acceptance, the lift experienced a number of additional failures. There were five electrical control faults and two breakages of the lifting screws. In March, 2000, MTA directed SEFAC, once again, to render a "root cause" analysis, this time by March 31. On April 26, SEFAC reported that the screw breakage resulted from an increase in torque, but it was unable to determine the "root cause" of the breakage and did not address the electrical control faults. From September 16, 1999, when the lift was accepted, to May 23, 2000—a total of 250 days—the lift was

out of service on 123 days. On June 8, 2000, MTA revoked its acceptance of the lift. It concluded that the lift was not a workable product, that there was virtually no likelihood that it ever would be a workable product, and that it was not in the State's interest to retain the lift. MTA advised SEFAC that it intended to terminate the contract for default and likely would ask SEFAC's surety to fulfill SEFAC's contractual obligations.

SEFAC then asked MTA to evaluate whether the lift was repairable. MTA hired two experts to make such an evaluation, and, upon receiving what it regarded as unfavorable evaluations from those experts, MTA concluded that repair was not practicable and that the lift had no value to MTA. On February 2, 2001, MTA terminated the contract for default and made demand on SEFAC's surety. SEFAC then filed a claim seeking payment of the $39,022 in retainage withheld by MTA and reserving the right to contest any monetary or equitable claim asserted by MTA. In its claim, SEFAC asserted that the revocation of acceptance was improper because:

"(1) MTA did not accept the lift 'on the reasonable assumption that its nonconformity would be cured'; (2) MTA's acceptance of the lift was not 'reasonably induced' either by the difficulty of discovery of a latent defect before acceptance or by SEFAC's assurances; (3) even if latent defects exist, MTA is estopped from denying prior knowledge of those defects; (4) MTA was not fraudulently induced into acceptance; (5) MTA did not revoke acceptance within a reasonable time after MTA discovered or should have discovered the ground for revocation; and (6) the lift underwent 'a substantial change after acceptance.' "

Letter from George D. Schuster, Procurement Officer, Mass Transit Admin., to Denise Louder, Vice President, SEFAC Lift & Equip. Corp. (Mar. 6, 2001). On March 6, 2001, in a statement of its final agency action, MTA rejected SEFAC's claim.

SEFAC's response was immediate, multi-faceted, and, in one instance, premature. On March 5, 2001, one day prior to MTA's final agency action, SEFAC filed this action in the Circuit Court, claiming that MTA, "[e]mploying thinly veiled pretext," had "arbitrarily and capriciously revoked its acceptance of [SEFAC's] equipment and without legal justification 'terminated it for default.' " The complaint alleged that many of the problems encountered with the lift were attributable to MTA—sequencing errors, mishandling of the equipment, employee ignorance and misconduct—and that the revocation of its acceptance was pretextual. SEFAC sought a declaratory judgment that MTA had revoked its acceptance and terminated the contract without legal justification and an injunction requiring MTA to lift its termination and restraining it from publicizing that termination.

The next day, March 6, SEFAC filed an appeal from the final agency decision to BCA. In its Notice of Appeal, SEFAC informed BCA of the Circuit Court action and stated that its appeal was a "conditional" one, to preserve the right to proceed in the event it was determined that BCA had primary or exclusive jurisdiction. In April, 2001, SEFAC filed two complaints for declaratory and injunctive relief before BCA, which were substantially similar to the complaint filed in the Circuit Court and sought essentially the same declaratory and injunctive relief. MTA moved to dismiss the Circuit Court complaint on the ground that SEFAC had failed to exhaust its administrative remedy before BCA, which MTA argued was exclusive, and, on April 30, 2001, the court granted that motion and dismissed the complaint.

## DISCUSSION

Title 15, subtitle 2 (§§ 15–201 through 15–223) of the State Finance and Procurement Article of the Maryland Code sets forth a comprehensive framework for the resolution of procurement contract disputes between State agencies and their contractors. The heart of that statutory framework is BCA, created by § 15–205. With an exception not relevant here, § 15–211 gives that agency jurisdiction to hear and decide "all

appeals" arising from the final action of a State agency on "a contract claim" concerning the breach, performance, modification, or termination of a procurement contract.

We have long held, and have recently confirmed, that "[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy." *State v. State Board of Contract Appeals*, 364 Md. 446, 457, 773 A.2d 504, 510 (2001); *Board of License Comm. v. Corridor Wine, Inc.*, 361 Md. 403, 418, 761 A.2d 916, 924 (2000). In *Driggs Corp. v. Maryland Aviation Admin.*, 348 Md. 389, 406–08, 704 A.2d 433, 442–43 (1998), we held that BCA has either primary or exclusive jurisdiction over procurement contract disputes encompassed by § 15–211 and that, as a result, "any judicial resolution of the matter, before a final decision by [BCA] would be premature." *State v. State Board of Contract Appeals, supra*, 364 Md. at 457, 773 A.2d at 510–11; *Driggs, supra*, 348 Md. at 407–08, 704 A.2d at 443.

SEFAC's position, which hinges on a misconstruction of our holding in *University of Md. v. MFE, Inc.*, 345 Md. 86, 691 A.2d 676 (1997), is that the dispute here is, in reality, a claim by MTA against *it*, that claims by State agencies do not fall within the definition or scope of "contract claim," that BCA's jurisdiction extends only to "contract claims," and that, accordingly, BCA has no jurisdiction in this matter. Given that lack of agency jurisdiction, it adds, there is no administrative remedy to exhaust and thus no impediment to its action in the Circuit Court. The revocation by MTA of its acceptance of the lift and its subsequent termination of the contract for default, SEFAC argues, was pretextual, and MTA should not be permitted, by that ruse, to circumvent the Circuit Court.

The dispute in *MFE, supra*, arose from a contract for architectural services awarded in 1981. The contract was completed, the building was erected, and all of the money due under the professional services contract was paid. In 1993—12 years after the completion of construction—the University

of Maryland asserted a $2.4 million claim against the architect for certain delay and additional construction costs allegedly incurred by the University as the result of deficiencies in MFE's design. We noted that the University was not then holding any money belonging to MFE and was not, therefore, attempting to set off its claim against any funds otherwise due to MFE, but rather was seeking to have. MFE pay the full amount of its claim. After reviewing in considerable detail the legislative history of the existing State procurement law and regulations, we concluded that, unlike the Federal procurement law, the Maryland law did not provide for subjecting independent contract claims by a governmental unit to the administrative BCA procedure. *Id.* at 103–04, 691 A.2d at 684. In suggesting a rationale for that approach, we noted:

"Ordinarily, a governmental unit having a claim against a contractor will know of the basis for its claim before it has accepted performance and paid the full amount of the contract price. In that circumstance, all the unit need do is make a claim and inform the contractor that the claim will be set off against funds owing on the contract. The contractor would then make a claim for the disputed amount, which would be subject to the BCA procedure. In most instances, therefore, it is unnecessary to make specific provision for the administrative adjudication of State contract claims. They can effectively be adjudicated in the context of the contractor's claim."

*Id.* at 102–03, 691 A.2d at 684.

An example of how that might work is found in *Driggs, supra.* The procurement contract at issue there was for the construction of a runway at Baltimore–Washington International Airport. Dissatisfied with the progress of the work, the State terminated the contract for default. Aggrieved, Driggs filed an appeal to BCA seeking, alternatively, to overturn the termination entirely or to convert the termination for default into a termination for convenience, which would allow it to recover damages. The State filed a counterclaim for damages based on its termination for default. For reasons of administrative convenience, BCA bifurcated the proceeding and dealt

first with whether the State properly terminated the contract for default, reserving, for the time, the issue of damages.

*For burden of proof purposes,* the termination for default was treated as a State claim against Driggs, upon which the State had the burden of proof. Following the presentation of the State's case on the bifurcated issue, Driggs moved for summary disposition and, when that motion was denied, it decided not to present any evidence. BCA thereafter rendered a decision that the State acted reasonably in terminating the contract, and Driggs sought immediate judicial review. We concluded that the petition for judicial review was premature because, by reserving the issue of damages, BCA had not issued a final decision in the matter, and that, as a general rule, judicial review of an administrative order lies only if the order is final. *Driggs,* 348 Md. at 408, 704 A.2d at 443.

The relevance of *Driggs* here is its clear recognition that, when a State agency terminates a procurement contract for default and the contractor contests that decision, BCA has jurisdiction over the matter and that the agency, in the administrative proceeding brought by the contractor, may seek damages by reason of the default. In that regard, the *Driggs* situation stands in stark contrast with the situation in *MFE.*

*Driggs* and *MFE* are not inconsistent, as argued by SEFAC; they are simply distinguishable from each other on their facts. The case now before us is much closer to *Driggs.* MTA revoked its acceptance of the lift and terminated the contract for default-decisions that SEFAC contests. If MTA prevails, the contract will not have been completed, as it was in *MFE,* and there will be funds otherwise belonging to SEFAC against which MTA could proceed. The claim by SEFAC that MTA's revocation and termination were pretextual goes to the merits of the dispute-the validity of those decisions. Although we have recognized that a party need not await a final administrative decision when the agency is "palpably without jurisdiction," *State v. State Board of Contract Appeals, supra,* 364 Md. at 458, 773 A.2d at 511, citing

*Commisson on Human Relations v. Mass Transit,* 294 Md. 225, 235, 449 A.2d 385, 390 (1982), that is clearly not the case here. The Circuit Court correctly found that SEFAC had failed to exhaust its statutory administrative remedy and, accordingly, dismissed the complaint.

JUDGMENT AFFIRMED, WITH COSTS.