966 A.2d 418

**UNIVERSITY SYSTEM OF MARYLAND**

v.

**Kevin MOONEY and Teresa Mooney.**

No. 38, Sept. Term, 2008.

Court of Appeals of Maryland.

Feb. 20, 2009.

392

Kathleen E. Wherthey, Asst. Atty. General (Douglas F. Gansler, Atty. General, and Sally L. Swann, Asst. Atty. General, Baltimore), on brief, for Petitioner.

Gordon S. Young (Jeremy S. Friedberg and Steven N. Leitess, Leitess, Leitess, Friedberg and Fedder, PC, Owings Mills), on brief, for Respondents.

Argued Before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE (Retired, Specially Assigned), IRMA S. RAKER (Retired, Specially Assigned,) JJ.

BATTAGLIA, Judge.

The case before us arises out of the attempt by Kevin and Teresa Mooney to institute suit in the Circuit Court for Prince George's County against the University System of Maryland, based upon the Mooneys' assignment rights in a contract entered into between the University and Chesapeake Cable, LLC, to which the Mooneys had loaned money. We shall hold that the Mooneys' suit must be dismissed because of their failure to exhaust the available administrative remedies.[1]

## I. Introduction

In October of 2002, Kevin and Teresa Mooney agreed to lend Chesapeake Cable, LLC ("Chesapeake"), the sum of

---

1. The University's Petition for Certiorari presented the following questions, which we have renumbered:
 1. If respondents may pursue a contract-based claim against the State, must it be presented administratively for review by the agency and the Maryland Board of Contract Appeals, as required by Title 15 of the State Finance & Procurement Article?
 2. Does the doctrine of sovereign immunity bar respondents' claim as assignee of contractual rights against the State?
 We shall not address the second question because of our disposition of the first.

$250,000 [2] in exchange for two promissory notes and a Security Agreement, which assigned Chesapeake's accounts receivable to the Mooneys in the event that Chesapeake were to default "in connection with the Loan, including but not limited to any principal, interest, penalty, fee, charge, deposit, advancement, escrow or assessment, or taxes or insurance premiums, as provided in the Note, the Agreement, or any other Loan Document." Kevin Mooney, whose affidavit states he was a "member" [3] of Chesapeake, signed the Security Agreement both as a lender and as a borrower.

In a letter dated April 9, 2003, the Mooneys gave Chesapeake written notice of default under the Security Agreement, for failure to make timely payments on the loan. The letter further advised that the Mooneys intended to take possession of Chesapeake's accounts receivable and to notify account debtors to make subsequent payments directly to the Mooneys. Two days later, on April 11, 2003, the Mooneys perfected their security interest in Chesapeake's accounts receivable by filing a financing statement with the Maryland Department of Assessments and Taxation.[4] The Mooneys also alleged in their complaint that they notified the University System of Maryland (the "University") [5] that, because the University was

---

2. It is undisputed that Chesapeake issued two promissory notes to the Mooneys in the amount of $200,000 and $50,000, although the Security Agreement refers only to a Credit Line Agreement for $200,000 and a promissory note for an unspecified amount. The total sum of money lent to Chesapeake, nevertheless, is not relevant to our analysis.

3. Under Section 4A–602 of the Corporations and Associations Article, Maryland Code (1975, 2002 Repl.Vol.), a member has an interest in the personal property of a limited liability company.

4. Perfection is defined as "[v]alidation of a security interest as against other creditors, usually by filing a statement with some public office or by taking possession of the collateral." Black's Law Dictionary 1173 (8th ed.2004).

5. The University of Maryland, College Park is a constituent institution of the University System of Maryland. Section 12–101 of the Education Article, Maryland Code (1978, 2001 Repl.Vol.).

an account debtor for $43,005.00 for cable services rendered by Chesapeake,[6] the University was to make payment to the Mooneys, although the University disputes receiving that letter.[7]

On April 22, 2003, the University issued a check to Chesapeake Cable for $43,005.00. Thereafter, on June 23, 2003, Kevin Mooney emailed an employee in "Accounts Payable" at the University, requesting a copy of the check to Chesapeake as well as a description of how it was cashed and by whom, because "the check was not deposited into Chesapeake's bank account and the company has no record for accounting purposes"; a copy of the check was faxed to Mooney on July 31, 2003.

On June 4, 2004, the Mooneys filed a complaint against the University in the Circuit Court for Prince George's County, alleging that the University violated Section 9–406(a) of the Commercial Law Article, Maryland Code (1975, 2002 Repl. Vol.),[8] "by making the Check payable to Chesapeake Cable only and by mailing the Check to Chesapeake Cable instead of the Mooneys." Damages were sought in the amount of

---

**6.** More specifically, an invoice sent from Chesapeake to the University reflects that the University was billed for "Doppler Radar Fiber Construction."

**7.** The dispute involving the issue of notice does not affect our conclusion regarding the Mooneys' failure to exhaust administrative remedies.

**8.** Section 9–406(a) of the Commercial Law Article, Maryland Code (1975, 2002 Repl.Vol.), states:

> Subject to subsections (b) through (j), an account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

Statutory references to the Commercial Law Article herein are to the Maryland Code (1975, 2002 Repl.Vol.), unless otherwise noted.

$43,005.00 "plus reasonable attorneys' fees, interest, costs of this action, and other expenses incurred by the Mooneys in enforcing their rights under the Loan Documents."

The University filed a Motion to Dismiss and Memorandum in Support, arguing that the Mooneys' complaint was barred, because the State "has waived sovereign immunity only as to written contracts" under Section 12–201(a) of the State Government Article, Maryland Code (1984, 1999 Repl.Vol.),[9] and that the Mooneys did not have a written contract with the University. The University also asserted that if sovereign immunity had been waived, the Mooneys also failed to file a claim with the appropriate authorities within the one year limitations period provided by Sections 12–202 or 12–106(b) of the State Government Article,[10] which govern contract and tort actions, respectfully. In the Motion to Dismiss and Memorandum in Support, the University also proffered that it

---

**9.** Section 12–201 of the State Government Article, Maryland Code (1984, 1999 Repl.Vol.), states:

> (a) *In general.*—Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

Statutory references to the State Government Article throughout are to the Maryland Code (1984, 1999 Repl.Vol.), unless otherwise noted.

**10.** Section 12–202 of the State Government Article, sets forth the time frame within which a contract claim against the State must be filed:

> A claim under this subtitle is barred unless the claimant files suit within 1 year after the later of:
> (1) the date on which the claim arose; or
> (2) the completion of the contract that gives rise to the claim.

Section 12–106(b) of the State Government Article, in turn, provides the time frame in which a tort claim against the State must be filed:

> (b) *Claim and denial required.*—A claimant may not institute an action under this subtitle unless:
> (1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;
> (2) the Treasurer or designee denies the claim finally; and
> (3) the action is filed within 3 years after the cause of action arises.

was neither an "account debtor" nor a "person," as defined in Section 9–102(a)(3) of the Commercial Law Article.

In their Opposition to Defendant's Motion to Dismiss, the Mooneys argued that their complaint was not barred by sovereign immunity, because the University waived sovereign immunity when it entered into the contract with Chesapeake, which was thereafter properly assigned, nor was their Compliant barred by the limitations period for contracts, because they filed suit within one year of the termination of the contract between Chesapeake and the University. The Mooneys also argued that although the University received timely notice, it "willfully disregarded the assignment" by making payment to Chesapeake and that the Maryland Uniform Commercial Code did apply to the University, which was a "person" under Title 9 of the Maryland Uniform Commercial Code.

The University's Motion to Dismiss was denied by the circuit court, which ordered that "the issues raised in the Defendant's Motion to Dismiss may be re-raised in a Motion for Summary Judgment wherein more factual issues can be discussed and considered." Soon thereafter, in October of 2004, the University filed an Answer to the Mooney's complaint, in which it admitted that it received the Mooneys' April 14, 2003, letter, but asserted as affirmative defenses that the Mooneys' claims were barred by sovereign immunity and the applicable statute of limitations.

Both parties subsequently filed cross motions for summary judgment echoing the arguments made in the Motion to Dismiss and Opposition thereto; both motions for summary judgment were denied. On September 7, 2005, the University filed a Motion for Leave to Amend Answer and an Amended Answer, denying that it received the April 14, 2003, letter; at a motions hearing that day, the circuit court judge granted the Mooneys' oral motion in limine to strike defendant's request for leave to amend answer. The circuit court judge, neverthe-

less, granted the University's Motion to Dismiss,[11] concluding that because there was no written contract between the Mooneys and the University, the claim was in essence a tort claim requiring the Mooneys to go through the procedures set forth in the Maryland Tort Claims Act.[12]

The Mooneys appealed to the Court of Special Appeals, arguing that the judge erred in determining that their suit was an action in tort. They also argued that they were entitled to sue the University based on the contract between Chesapeake and the University. The University, conversely, argued that the Mooneys' claim was barred for failure to comply with the Maryland Tort Claims Act and, alternatively, that the Mooneys could not maintain a contract action against the University because the University had no contract with the Mooneys. In an unreported opinion, the intermediate appellate court concluded that, because the suit was not an action in tort, but instead "a suit brought under Maryland's UCC to enforce the Mooneys' alleged security interest in the monies due Chesapeake under its contract with [the University]," the judgment of the circuit court, based on the theory that the suit was an action in tort, could not stand.

On remand, the University filed a "Motion to Dismiss or in the Alternative for Summary Judgment In Response to the Ruling of Court of Special Appeals," and the Mooneys filed a "Renewed Motion for Summary Judgment." The University argued that, because the "General Assembly of Maryland has not waived the sovereign immunity of the State and its units [13

---

**11.** The Court of Special Appeals later recognized that "the ruling, though couched as a dismissal, [was] in fact a grant of summary judgment."

**12.** The Maryland Tort Claims Act is codified in Section 12–101 through 12–110 of the State Government Article.

**13.** A "unit" is defined as "an officer or other entity that is in the Executive Branch of the State government and is authorized by law to enter into a procurement contract." Section 11–101 of the State Finance and Procurement Article, Maryland Code (1988, 2001 Repl.

[1] under Title 9 of the [Commercial Law Article]," the Mooneys could not sue the University under that Article, while the Mooneys reasserted that the University violated Section 9–406(a) of the Commercial Law Article when it sent the check to Chesapeake, even though they had been properly assigned Chesapeake's accounts receivable rights. After another hearing on the motions, the circuit court judge granted the University's Motion to Dismiss, concluding that "there is no express waiver of Sovereign Immunity under Title 9 of the [Commercial Law Article]."

The Mooneys again appealed to the Court of Special Appeals, which, in a reported opinion, stated that the appropriate question was not whether the University had waived sovereign immunity under the Commercial Law Article, but whether the Mooneys, as secured parties whose debtor was in default, could enforce the debtor's contractual rights against the University, and whether the University had waived sovereign immunity with respect to the debtor's contractual rights. *Mooney v. University System of Maryland*, 178 Md.App. 637, 641, 943 A.2d 108, 110 (2008). The intermediate appellate court then concluded that the University had waived sovereign immunity and that the Mooneys could enforce Chesapeake's contractual rights. The opinion also noted that the waiver of sovereign immunity existed for only one year under Section 12–202 of the State Government Article and further that the Mooneys "needed to file the suit within one year of the termination of the contract." *Id.* at 646, 943 A.2d at 113. In order to determine when the contract was terminated, as well as whether the Mooneys gave proper notice to the University of the assignment, the court vacated the judgment of the circuit court and remanded for further proceedings. *Id.* at 647, 943 A.2d at 113.

Vol.). In the present case the State unit is the University System of Maryland.

Statutory references to the State Finance and Procurement Article herein are to the Maryland Code, (1988, 2001 Repl.Vol.).

The University petitioned for certiorari, which we granted, *University Systems v. Mooney*, 405 Md. 290, 950 A.2d 828 (2008). We shall reverse the judgment of the Court of Special Appeals and hold that the Mooneys, as assignees of accounts receivable due under a contract with the University, were required to exhaust the available administrative remedies before seeking judicial relief, and because they failed to do so, they cannot pursue the present action.

## II. Discussion

The University asserts that even if the Mooneys could pursue a claim, they were first required to exhaust their administrative remedies by submitting a contract claim to the procurement officer and protesting the denial to the Maryland State Board of Contract Appeals ("Appeals Board") before seeking judicial review, which they failed to do. The Mooneys, conversely, argue that we should not consider the issue of whether they were required to first exhaust their administrative remedies because the issue was raised for the first time in the Petition for Certiorari. The Mooneys also allege that they are not a "contractor" or "a person who has been awarded a procurement contract" under the State Finance and Procurement Article, so that they are not required to proceed administratively before pursuing judicial remedies.

With respect to the fact that exhaustion of administrative remedies was raised seminally before us, we ordinarily will not consider an issue in this Court "unless it plainly appears by the record to have been raised in or decided by the trial court." Maryland Rule 8–131(a) [14]; *see also Robinson v. State*, 404 Md. 208, 216, 946 A.2d 456, 461 (2008); *Burch v.*

---

**14.** Maryland Rule 8–131(a) provides:
> The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

*United Cable,* 391 Md. 687, 695, 895 A.2d 980, 984 (2006); *Fitzgerald v. State,* 384 Md. 484, 505, 864 A.2d 1006, 1018 (2004). The purpose of the Rule is "to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings" and "to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation." *Robinson,* 404 Md. at 216–17, 946 A.2d at 461; *Fitzgerald,* 384 Md. at 505, 864 A.2d at 1018; *County Council v. Offen,* 334 Md. 499, 509, 639 A.2d 1070, 1075 (1994).

■ Although we usually will not consider an issue that has not been raised below, there is "a limited category of issues, in addition to jurisdiction, which an appellate court ordinarily will address even though they were not raised by a party." *Moats v. City of Hagerstown,* 324 Md. 519, 525, 597 A.2d 972, 975 (1991). One of these issues is the exhaustion of administrative remedies, which we will address when raised for the first time before us, or on our own initiative. *See Furnitureland South, Inc. v. Comptroller of Treasury of State,* 364 Md. 126, 132, 771 A.2d 1061, 1065 (2001); *Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438, 450–451 & n. 7, 452, 758 A.2d 995, 1002 & n. 7, 1003 (2000); *Maryland Reclamation Associates, Inc. v. Harford County,* 342 Md. 476, 490 n. 10, 677 A.2d 567, 574 n. 10 (1996).

■ The determination of whether we will address exhaustion of administrative remedies, when raised for the first time in this Court or on our own initiative, is in part dependent on whether the statutory scheme in which the administrative remedy is included is deemed to be exclusive, primary or concurrent. *See Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 60–61, 706 A.2d 1060, 1067–68 (1998). We have articulated that where the administrative remedy is deemed primary, the issue can be raised by this Court sua sponte; in *Board of Education for Dorchester County v. Hubbard,* 305 Md. 774, 786–87, 506 A.2d 625, 631 (1986), we stated:

Where ... the administrative remedy is deemed to be primary, this Court has generally held that it must be pursued and exhausted before a court exercises jurisdiction to decide the controversy. *Wash. Sub. San. Comm'n v. Mitchell & Best, supra,* 303 Md. [544] at 553–554, 495 A.2d [30 (1985) ]; *Md. Comm'n on Human Rel. v. B.G. & E. Co.,* 296 Md. 46, 50, 459 A.2d 205, 208 (1983); *Md. Comm'n on Human Rel. v. Beth. Steel,* 295 Md. 586, 592, 457 A.2d 1146, 1149 (1983), and cases there cited. As explained in *Sec., Dep't of Human Res. v. Wilson, supra,* 286 Md. [639] at 645, 409 A.2d 713 [1979],

> "when the Legislature enacts a comprehensive remedial scheme in which a claim is to be determined by an administrative agency and reviewed in an administrative appeal before judicial review is available, it establishes, as public policy, that such a procedure produces the most efficient and effective results. In order to effectuate this public policy, trial courts generally should not act until there has been compliance with the statutory comprehensive remedial scheme."

While the failure to invoke and exhaust an administrative remedy does not ordinarily result in a trial court's being deprived of fundamental jurisdiction, nevertheless, because of the public policy involved, the matter is for some purposes treated *like* a jurisdictional question. Consequently, issues of primary jurisdiction and exhaustion of administrative remedies will be addressed by this Court sua sponte even though not raised by any party.

(Emphasis in original).[15] The notion of primary, in this context, is juxtaposed against the concepts of "exclusive" adminis-

---

**15.** The Mooneys reliance on *Jones v. State,* 379 Md. 704, 843 A.2d 778 (2004), is misplaced. In *Jones,* we did not consider the failure to exhaust administrative remedies, but rather, whether the Court of Special Appeals properly exercised its discretion when it remanded a post-conviction complaint to the circuit court for consideration of the coconspirator exception to the hearsay rule, even though that issue was raised for the first time on appeal. The safeguard promulgated in *Jones,* 379 Md. at 714–15, 843 A.2d at 784, providing for appellate

trative remedies, under which the sole remedy is administrative, and concurrent administrative remedies, by which a claimant may pursue judicial remedies without first having to exhaust administrative remedies. *See Bell Atlantic of Maryland, Inc. v. Intercom Systems Corp.*, 366 Md. 1, 11–12, 782 A.2d 791, 797 (2001). In one of our more recent cases, in which we had occasion to explore the exhaustion of administrative remedies, *Bell Atlantic of Maryland, Inc. v. Intercom Sys. Corp.*, 366 Md. 1, 11, 782 A.2d 791, 796–97 (2001), we were asked to decide whether an internet service provider, Intercom, which alleged tortious interference with contractual relations, negligence and breach of contract against its telecommunications provider, Bell Atlantic, appropriately filed suit in the Circuit Court for Prince George's County. Because there were administrative remedies available to address many of Intercom's claims, we were tasked with determining whether those remedies were exclusive, primary or concurrent. In our analysis, we extensively relied on the language in *Zappone v. Liberty Life Insurance Company*, in which Judge John C. Eldridge, writing for this Court, succinctly articulated the distinction between exclusive, primary and concurrent administrative remedies:

> *First*, the administrative remedy may be exclusive, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy. *Second*, the administrative remedy may be primary but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.

review when consideration of an issue would not prejudice a criminal defendant and would, instead, promote the administration of justice, is inapplicable in the present case.

*Conyers v. State*, 367 Md. 571, 790 A.2d 15 (2002) and *State v. Bell*, 334 Md. 178, 638 A.2d 107 (1994), also cited by the Mooneys, are inapposite as well.

* * *

> *Third,* the administrative remedy and the alternative judi-
> cial remedy may be fully concurrent, with neither remedy
> being primary, and the plaintiff at his or her option may
> pursue the judicial remedy without the necessity of invoking
> and exhausting the administrative remedy.

*Bell Atlantic,* 366 Md. at 11–12, 782 A.2d at 797, quoting
*Zappone,* 349 Md. at 60–61, 706 A.2d at 1067–68 (1998) (em-
phasis in original). We then went on to summarize the
Zappone analysis, which provides a general framework for
determining whether an administrative remedy is exclusive,
primary, or concurrent:

> We emphasized that "where neither the statutory language
> nor the legislative history disclose an intent that the admin-
> istrative remedy is to be exclusive, and where there is an
> alternative judicial remedy under another statute or under
> common law or equitable principles, there is no presumption
> that the administrative remedy was intended to be exclu-
> sive." *Zappone,* 349 Md. at 63, 706 A.2d at 1069. Instead,
> we found a rebuttable presumption that in the absence of
> specific statutory language indicating otherwise, an adminis-
> trative remedy was intended to be primary. *See id.* at 63–
> 64, 706 A.2d at 1069. In evaluating this presumption, we
> are encouraged to consider numerous factors, including the
> "comprehensiveness of the administrative remedy," the
> agency's view of the scope of its jurisdiction, and the
> "nature of the alternative judicial cause of action pursued by
> the plaintiff" in refuting the presumption that the legisla-
> ture intended the administrative remedy to be primary.
> *See id.* at 64–65, 706 A.2d at 1070.

*Bell Atlantic,* 366 Md. at 12, 782 A.2d at 797.

We then applied the *Zappone* analysis to the statutory
scheme at issue in *Bell Atlantic,* which in Section 3–102(a) of
the Public Utilities Article, Maryland Code (1998), stated that
"[a]ny person may file a complaint with the Commission." We
concluded that the statutory scheme was not intended to be
the exclusive remedy for consumers with complaints against

public services companies, because the scheme was not "explicit in its language requiring exhaustion of administrative remedies." *Bell Atlantic,* 366 Md. at 25–26, 782 A.2d at 805–06. We then recognized, nonetheless, that because the Public Utilities Article was not intended to be exclusive, it was presumably primary. We further noted that although "other cognizable claims sounding in tort for compensatory and punitive damages arising out of the service contracts with Bell Atlantic cannot be resolved by the [Public Service Commission]," because the action was primary, the consumer could first file a claim with the Commission and thereafter file an independent judicial action, which would be stayed until the administrative proceedings were resolved. *Id.* at 27–28, 782 A.2d at 806–07.

At the outset of our analysis of the statutory framework in the present case, we note that the University System generally is not governed by Division II of the State Finance and Procurement Article because Section 11–203(e) of that Article provides, in pertinent part:

(e) *University System of Maryland.*—(1)(i) In this subsection the following words have the meanings indicated.

(ii) "Board of Regents" means the board of Regents of the University System of Maryland.

(iii) "University" means the University System of Maryland.

(2) Except as otherwise provided in this subsection, this *Division II does not apply to the University System of Maryland.*

(3)(i) A procurement by a University shall comply with the policies and procedures developed by the University and approved by the Board of Public Works and the Administrative, Executive, and Legislative Review Committee of the General Assembly in accordance with § 12–112 of the Education Article.

(Emphasis added). Section 12–112 of the Education Article, *Maryland Code* (1978, 2001 Repl.Vol.), is complementary:

(a)(1) Except as provided in § 11–203(e) of the State Finance and Procurement Article, the University is exempt from Division II of the State Finance and Procurement Article.

(2)(i) Subject to review and approval by the Board of Public Works and the Administrative, Executive, and Legislative Review Committee of the General Assembly, the Board of Regents shall develop policies and procedures governing procurements by the University.

(ii) The policies and procedures developed under subparagraph

(i) of this paragraph shall promote the purposes of the State procurement law as set forth in § 11–201 of the State Finance and Procurement Article.

As a result, the Board of Regents, under the powers delegated to it by the Legislature, has developed Procurement Policies and Procedures for the University System, Section X of which governs protests in connection with the solicitation and award of contracts as well as contract claims and provides that "[a]n aggrieved party shall exhaust all administrative remedies provided in this section before seeking judicial review." University of Maryland Policies and Procedures Manual, Section VIII–' 3.00, Subsection X, *available at* http://www.president.umd.edu/ policies/. The Procurement Policies and Procedures also include an extensive scheme governing protests involving the award of contracts, but subject the University to the dispute resolution procedures in the State Finance and Procurement Article when contract claims are involved:

> All claims shall be handled in accordance with Title 15, Subtitle 2 of the State Finance and Procurement Article, Annotated Code of Maryland and Code of Maryland Regulations, Title 21, Subtitle 10—Administrative and Civil Remedies, Chapters 04, 05, and 06 as may be amended from time to time.

*Id.* at X(c). A contract claim, as defined by Section 15–215 of the State Finance and Procurement Article, "includes a claim

about the performance, breach, modification, or termination of the procurement contract."

The statutory framework in the State Finance and Procurement Article, includes Section 15–217, which provides that "a person who has been awarded a procurement contract may submit a claim to the procurement officer," Section 15–220, which provides that a contractor "may appeal the final action of a unit to the Appeals Board," and Section 15–223, which provides for judicial review of "a final decision of the Appeals Board." The jurisdiction of the Appeals Board, in turn, is governed by Section 15–211 of the State Finance and Procurement Article, which states that, "[t]he Appeals Board shall have jurisdiction to hear and decide all appeals arising from the final action of a unit."

Application of the *Zappone* factors to the statutory scheme entails consideration of whether "the Legislature has indicated that the administrative remedy is exclusive." We note that the Appeals Board does have jurisdiction over *"all* appeals arising from the final action of a unit...."[16] Although the plain meaning of the word "all," which is defined as "the whole amount, quantity, or extent of," *see* Merriam–Webster's Collegiate Dictionary 31 (11th ed.2003), suggests an intent on the part of the Legislature to consider the jurisdiction of the Appeals Board as exclusive, there is no such indication in Section 15–217(a)(2) of the State Finance and Procurement Article, which states, in pertinent part, that a "person who has been awarded a procurement contract may submit a contract claim to the procurement officer," nor Section 15–220, which provides that a contractor "may appeal the final action of a unit to the Appeals Board." Like the statutory provisions we analyzed in *Bell Atlantic*, 366 Md. at 20, 782 A.2d at 802, one of which stated that "[a]ny person may file a complaint with the Commission," *see* Section 3–102(a)(1) of the Public Utilities Article, Maryland Code (1998), the language in Sections 15–

---

**16.** Section 15–211(a)(2) of the State Finance and Procurement Article, we note, does except from the jurisdiction of the Appeals Board "a contract claim relating to a lease of real property."

217 and 15–220 of the State Finance and Procurement Article does not explicitly require initial exhaustion of administrative remedies to the exclusion of the invocation of judicial remedies.

In the absence of exclusivity, we have recognized that there arises "a rebuttable presumption that in the absence of specific statutory language indicating otherwise, an administrative remedy was intended to be primary," *Bell Atlantic,* 366 Md. at 12, 782 A.2d at 797, and this presumption is not rebutted in the present case. The statutory scheme for resolution of disputes occupies an entire subtitle in the State Finance and Procurement Article and is, indeed, comprehensive, encompassing the Mooneys' cause of action sounding in breach of contract. Additionally, the agency certainly views its jurisdiction as primary, having posited that "the Appeals Board shall have jurisdiction to hear and decide all disputes arising under a contract with any State agency, or as a result of a breach of a contract with any State agency. . . ." [17] COMAR 21.02.02.02.

In deciding that the statutory scheme under consideration is primary, we obviously reject that it could be concurrent; we do so because under the statute, more specifically Section 15–211 of the State Finance and Procurement Article, the agency is given authority to entertain "all appeals arising from the final action of a unit" on a claim for the breach, performance, termination or modification of a contract. This recognition that the statutory scheme embodies a primary administrative remedy is undergirded by our decision in *SEFAC Lift & Equip. Corp. v. Mass Transit Admin.,* 367 Md. 374, 788 A.2d 192 (2002), in which we had occasion to consider the same statutory framework in issue and deemed it "either primary or exclusive." In *SEFAC,* Judge Alan M. Wilner, then writing for this Court, remarked:

Title 15, subtitle 2 (§§ 15–201 through 15–223) of the State Finance and Procurement Article of the Maryland Code sets

---

**17.** COMAR 21.02.02.02 does except from the jurisdiction of the Appeals Board labor disputes and "contract claim[s] relating to a lease of real property."

forth a comprehensive framework for the resolution of procurement contract disputes between State agencies and their contractors. The heart of that statutory framework is [the Appeals Board], created by § 15–205. With an exception not relevant here, § 15–211 gives that agency jurisdiction to hear and decide "all appeals" arising from the final action of a State agency on "a contract claim" concerning the breach, performance, modification, or termination of a procurement contract.

We have long held, and have recently confirmed, that "[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy." *State v. State Board of Contract Appeals*, 364 Md. 446, 457, 773 A.2d 504, 510 (2001); *Board of License Comm. v. Corridor Wine, Inc.*, 361 Md. 403, 418, 761 A.2d 916, 924 (2000). In *Driggs Corp. v. Maryland Aviation Admin.*, 348 Md. 389, 406–08, 704 A.2d 433, 442–43 (1998), we held that [the Appeals Board] has either primary or exclusive jurisdiction over procurement contract disputes encompassed by § 15–211 and that, as a result, "any judicial resolution of the matter, before a final decision by [the Appeals Board] would be premature." *State v. State Board of Contract Appeals*, *supra*, 364 Md. at 457, 773 A.2d at 510–11; *Driggs*, *supra*, 348 Md. at 407–08, 704 A.2d at 443.

*Id.* at 379–80, 788 A.2d at 195–96.

■ The Mooneys argue, nevertheless, that even were Chesapeake required to exhaust its administrative remedies before seeking judicial relief, they, as assignees, were not so required, because they were not "[a] person who has been awarded a procurement contract" nor a "contractor" under Sections 15–217 and 15–220 of the State Finance and Procurement Article, respectively, which provided:

**Section 15–217. Submission of protest or contract claim.**

(a)(1) *In general.*—A prospective bidder or offeror, a bidder, or an offeror may submit a protest to the procurement officer.

(2) A person who has been awarded a procurement contract may submit a contract claim to the procurement officer.

(b) *Time for submission.*—Except as provided in § 15–219 of this subtitle, a protest or contract claim shall be submitted within the time required under regulations adopted by the primary procurement unit responsible for the procurement.[18]

\* \* \*

### Section 15–220. Appeal from unit's decision—In general.

(a) *Appeals of final action.*—Except for a contract claim related to a lease for real property, a bidder or offeror, a prospective bidder or offeror, a unit, or a contractor may appeal the final action of a unit to the Appeals Board.

(b) *Time for filing.*—An appeal under this section shall be filed:

(1) for a protest, within 10 days after receipt of the notice of a final action; and

(2) for a contract claim, within 30 days after receipt of the notice of a final action.

■ To determine whether an assignee comes within the meaning of "person" in Section 15–217 of the State Finance and Procurement Article, we first look to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007) (internal quotations omitted). A "person" in Section 15–217 of

---

**18.** Section 15–217(a)(2) was amended by Chapter 373 of the Maryland Laws of 2004 to state:

A unit or a person who has been awarded a procurement contract may submit a contract claim to the procurement officer.

the State Finance and Procurement Article, is defined in Section 11–101 of the same Article as "an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity." Clearly, the language of "receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind" does not include only the person awarded the procurement contract, but third parties representing the interests of the contracting party. A "receiver," furthermore, is defined as a "disinterested person appointed by a court, or by a corporation or other person, for the protection or collection of property that is the subject of diverse claims," Black's Law Dictionary 1296 (8th ed.2004). Obviously, then, a third-party who serves some of the same functions of a receiver, by collecting property due to another, must also be accommodated by the statutory definition.

We recognized that the rights of an assignee are concomitant to those of an assignor in *James v. Goldberg*, 256 Md. 520, 527, 261 A.2d 753, 757 (1970), wherein we stated:

An unqualified assignment generally operates to transfer to the assignee all of the right, title and interest of the assignor in the subject of the assignment and does not confer upon the assignee any greater right than the right possessed by the assignor.

More recently, in *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 653 n. 8, 741 A.2d 1099, 1106 n. 8 (1999), we also recognized that assignees are "bound to the same limitations period as their assignor." Our conclusion, furthermore, that a "person who has been awarded a procurement contract" or "contractor" includes the assignees of contractual rights, is buttressed by Section 9–404(a) of the Commercial Law Article, which provides that "the rights of an assignee are subject to":

(1) *All* terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

(2) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor re-

ceives a notification of the assignment authenticated by the assignor or the assignee.

(Emphasis added).

 If an assignee is subject to all terms of the agreement between the assignor and the account debtor, including the burden of complying with the same limitations period as the assignor, they surely also must be subject to any condition precedent to the invocation of judicial remedies to which the assignor would be subject. Exhaustion of administrative remedies, in the present case, is such a condition precedent, and without satisfying such a condition "the action itself is fatally flawed." *Rios v. Montgomery County,* 386 Md. 104, 127, 872 A.2d 1, 14 (2005). To hold otherwise would provide the Mooneys with greater rights than Chesapeake, which we will not do.

The Mooneys, nevertheless, also point to *University of Maryland v. MFE Incorporated / NCP Architects, Inc.,* 345 Md. 86, 691 A.2d 676 (1997), to support their assertion that only the primary contractor is required to comply with the administrative remedy governing procurement contract disputes. To the contrary, in that case, we held only that the State did not have the opportunity to utilize the administrative remedies under Section 15–217 of the State Finance and Procurement Article by appealing a unit decision against the Board of Appeals. We noted that "the omission to authorize contract claims by a State unit is significant," *id.* at 345 Md. at 93, 691 A.2d at 679, and since that time the Legislature has responded by amending Section 15–217(a)(2) of the State Finance and Procurement Article to allow a State unit to submit a contract claim to the procurement officer. *See* 2004 Maryland Laws, Chapter 373.

Where, as here, an administrative remedy is primary, so that exhaustion of administrative remedies must occur prior to seeking judicial relief, we have suggested that:

[A disputant] first must file a complaint with [the administrative agency] and then may decide to file an independent judicial action. Thereafter, the trial court must stay the

independent judicial action upon the request of either party until after final resolution of the administrative proceeding. *Bell Atlantic,* 366 Md. at 27, 782 A.2d at 806–07. *See also Arroyo v. Board of Educ. of Howard County,* 381 Md. 646, 660, 851 A.2d 576, 584–85 (2004) ("[W]e perceive that there is no prohibition against filing an independent judicial action while primary administrative proceedings are under way, but, that there is a prohibition against deciding, i.e., adjudicating, the issue in the independent judicial case until a final administrative determination is made.") (emphasis in original). If there was any doubt about whether to proceed administratively or through the courts, the Mooneys could have filed their claim administratively and judicially; the circuit court action then could have been stayed pending the administrative decision.

In their complaint, the Mooneys alleged that the University was in breach under 9–405 of the State Finance and Procurement Article when it issued the check to Chesapeake on April 22, 2003. The Mooneys could have protested this denial of their claim to the Appeals Board within 30 days after April 22, 2003, within the meaning of Section 15–220 of the State Finance and Procurement Article, but chose not to do so, instead attempting to invoke judicial remedies. Because we have recognized that the exhaustion of administrative remedies is a condition precedent to the right to sue, we affirm the dismissal of the Mooneys complaint in the Circuit Court, rather than remand for further proceedings.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Dissenting Opinion by MURPHY, J.

The complaint that is to be dismissed on the basis of the majority opinion was filed on June 4, 2004. Petitioner never

argued to the Circuit Court that the complaint should be dismissed on the ground that the respondents had failed to "exhaust" their administrative remedies. Petitioner never presented this argument in the briefs it filed on the two occasions when the case at bar was pending in the Court of Special Appeals. Petitioner's "exhaustion" argument was presented for the first time at the second oral argument in the Court of Special Appeals. *Mooney v. University System,* 178 Md.App. 637, 647 n. 2, 943 A.2d 108 (2008). While this issue may be raised for the first time in this Court, I am persuaded that Respondents' complaint should not be dismissed.

If Petitioner had disputed Chesapeake's right to receive payment, and Chesapeake assigned its *unpaid* $43,005.00 claim to Respondents, Respondents would have been required to proceed administratively before the Board of Contract Appeals. The case at bar, however, does not involve a dispute between Petitioner and Chesapeake. While I agree with the majority that "[a] 'person' in Section 15–217 of the State Finance and Procurement Article ... does not include only the person awarded the procurement contract, but third parties representing the interests of the contracting party[,]" I do not agree that Respondents should be included in the definition of "person" on the ground that they are involved in the process of "collecting property due to another[.]" Because Respondents are not "representing the interests of the contracting party," and are not attempting to collect funds that Petitioner had withheld from Chesapeake, I would affirm the judgment of the Court of Special Appeals and order that this case be returned to the Circuit Court for further proceedings not inconsistent with the March 3, 2008 opinion of the Court of Special Appeals.