SALARIO, Judge.
The Florida Department of Transportation appeals from a final summary judgment declaring it legally obligated to United Capital Funding Corp. for the payment of certain accounts receivable that had been assigned to United Capital by one of the Department’s vendors, Arbor One, Inc. The appeal centers on a .provision of Article 9 of the Uniform Commercial Code— codified at section 679.4061, Florida Statutes (2012)—stating that, after receiving notice of an assignment, the debtor on an account receivable can discharge its con *128 tractual obligation to pay the account only by making payment to the assignee and not the assignor. The Department was originally under a contractual obligation to pay Arbor One for services Arbor One provided. Arbor One sold its right to be paid for those services to United Capital, but the Department continued to pay Arbor One despite having received notice of that sale. The issues in this case are (1) whether the statute governs when a government agency is the account debtor and, if so, (2) whether sovereign immunity bars a suit against the government agency by an assignee when the agency improperly pays the assignor instead of the assignee.[1]
We answer the first question in the affirmative and the second question in the negative. As a result, we conclude that once Arbor One’s accounts receivable were sold, the Department could discharge its contractual obligation to pay for those services only by paying United Capital as required by section 679.4061 and that sovereign immunity does not bar United Capital’s suit against the Department to enforce its contractual obligation to pay. We therefore affirm the summary judgment in favor of United Capital.
I.
A.
The case involves the business of factoring. Factoring is a financial arrangement through which a business can obtain immediate funding from a third party by using its accounts receivable—sums owed to the business by its customers, usually on invoices for goods sold or services provided—as consideration. In a factoring arrangement, the business sells its accounts receivable to a third party, called a factor, at a discount from their face value. The factor takes ownership of the accounts receivable and, as a consequence, takes the sole right to receive the entirety of payments previously owed to the business. Ordinarily, the factor notifies the debtor on the sold accounts of the change in ownership and thereafter receives payments directly from the account debtor.
Factoring relationships implicate Article 9 of the UCC because Article 9 applies to the sale of accounts, including accounts receivable. § 679.1091(l)(c). In that connection, section 679.4061 defines the rights and obligations of the business that originates and sells the accounts receivable, the debtors on the accounts, and the third parties to whom the accounts are sold. As applied to a factoring arrangement, the statute provides that an account debtor makes payments to the business .originating the account until such time as it is notified by either the business or the factor that the account has been assigned to the factor. § 679.4061(1). Once that notification is given, an account debtor must make all further payments to the factor, subject to a right of the account debtor to demand proof from the business or the factor that the account has in fact been assigned. §§ 679.4061(1), (3). The statute also provides that any term in an agreement between the business originating the accounts and its debtors that prohibits or restricts the assignment of the accounts is ineffective. § 679.4061(4)(a).
One effect of the statute is to place an account debtor at risk if, after it receives notice of the assignment, it continues to pay the business that originated the account instead of the factor who bought the *129 right to be paid under it. The statute provides that a payment made to the business after notice has been given does “not discharge the obligation” owed by the account debtor on the account. § 679.4061(1). An account debtor who continues to pay the business that originated the account after receiving notice that the account has been assigned can be held liable to the factor for the full amount of the account notwithstanding its payment of that same amount to the business. See Bldg. Materials Corp. of Am. v. Presidential Fin. Corp., 972 So.2d 1090, 1092 (Fla. 2d DCA 2008) (“[A] debtor who receives actual notice of the assignment of an account receivable ... may be held liable to the assignee if the debtor later pays the assigned debt to the assignor rather than the assignee.”). This is sometimes referred to as a risk of double payment.
B.
The Department entered into several contracts with Arbor One, pursuant to which Arbor One provided it with roadside maintenance services and the Department agreed to pay Arbor One for services rendered. The Department became, in UCC terms, an account debtor with an obligation to pay Arbor One. Arbor One later entered into a factoring arrangement with United Capital. Under that arrangement, Arbor One assigned the accounts receivable generated under its contract with the Department to United Capital, making Arbor One the assignor of those accounts and United Capital the assignee.
United Capital notified the Department of the assignments in writing. The written notifications described the arrangement between Arbor One and United Capital, explained that Arbor One had assigned its accounts receivable to United Capital, stated that all future payments should be made to United Capital, and stated that payment to any other party would not discharge the Department’s obligations on the accounts. Although it received the notices, the Department nonetheless continued to pay Arbor One and refused to pay United Capital.
In response, United Capital filed this declaratory judgment action against the Department seeking to enforce its rights to payment of the accounts receivable that Arbor One assigned to it, which in its view was required by section 679.4061(1). It later filed a motion for summary judgment that, as relevant here, the Department opposed on two principal grounds. First, the Department argued that section 679.4061(1) does not apply where, as here, a government agency is the account debtor on assigned accounts receivable. Second, the Department argued that it was entitled to sovereign immunity because the Department had not originally contracted with United Capital and had not otherwise agreed to make contract payments to it.
The trial court rejected the Department’s arguments, granted United Capital’s motion for summary judgment, and entered a final judgment in United Capital’s favor. The Department timely appealed.
II.
In this case, there is no dispute as to any of the salient facts. The trial court’s determinations that the Department was obligated under section 679.4061(1) to make payments directly to United Capital and that sovereign immunity did not bar United Capital’s claims against the Department resolved pure questions of law. Our review is de novo. See Shaw v. Tampa Elec. Co., 949 So.2d 1066, 1069 (Fla. 2d DCA 2007); Allstate Ins. Co. v. Regar, 942 So.2d 969, 971 (Fla. 2d DCA 2006).
*130 A.
■ We first consider whether section 679.4061(1) applies when a government body like the ■ Department stands in the role of account debtor. We hold that it does.
Section 679.4061 is titled “Discharge of account debtor; notification of assignment; identification and proof of assignment; restrictions on assignment of accounts, chattel paper, payment intangibles, and promissory notes ineffective.” Overall, the statute provides for free alienability of accounts, chattel paper, and payment intangibles by invalidating certain contractual and legal restrictions on their sale and specifies the rights and obligations ,of the parties when a sale of such assets occurs. §§ 679.4061(1), (4), (6). As concerns the rights and obligations of the parties, subsection (1) of section '679.4061 provides as follows:
[A]n account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, .that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.
If the statute governs here, the Department, as an account debtor on the accounts receivable Arbor One assigned to United Capital, could discharge its contractual obligation to pay those accounts receivable only by paying,United Capital as-the as-signee, and its failure to do so would subject the Department to liability to United Capital.[2]
On the face of it, there is no question that section 679.4061(1) is by its terms operative on these facts because there is no question that the statutory term “account debtor”—which identifies the category of persons obligated to make payment to an assignee of accounts receivable— reaches government agencies like the Department, Article 9 of the UCC defines “account debtor” as “a person obligated on an account, chattel paper, or géneraí intangible.” § 679.1021(1)(c). The general definitions section of the UCC, in turn, defines “person” to- include a “government” or “governmental subdivision, agency, or instrumentality” unless the context in which it is used indicates otherwise. § 671.201(30), Fla. Stat. (2012). We see nothing in sections 679.1021(c) or 679.4061(1) to indicate that the terms “account debtor” and “person” do not mean what the definitions say they mean. As such, we give, the term “account debtor” the meaning the legislature gave it. See Nicholson v. State, 600 So.2d 1101, 1103 (Fla. 1992). That meaning includes the Department, which renders 679.4061(1) operative as to the Department’s discharge of its obligation on assigned accounts receivable.
The Department argues, however, that another provision of Article 9 places governmental account debtors outside the reach of that statute. It points to section 679.1091, titled “Scope,” and in particular to subsection (4)(n), which states that *131 “[t]his chapter does not apply to ... [a]ny transfer by a government or governmental unit.” It asserts that because its payments on the accounts receivable at issue involve transfers of money by a governmental unit, the so-called government-transfer exception in section 679.1091(4)(n) prevents section 679.4061(1) from regulating how it may discharge its contractual obligation to make payment for the services Arbor One rendered to it. If the provisions of section 679.4061(1) could be read to “apply to” a “transfer” by a governmental unit where the governmental unit is merely an account debtor making a payment to the assignee of an account receivable rather than the assignor of that account, then the Department’s argument here would be correct. But, as we explain, the plain language of section 679.1091 excludes this construction.[3]
The only published decision to address this question is MP Star Financial, Inc. v. Cleveland State University, 107 Ohio St.3d 176, 837 N.E.2d 768 (Ohio 2006), which held - that Ohio’s analog to section 679.4061(1) does not apply to governmental account debtors. In MP Star, a vendor to a state university sold its accounts receivable to a factor. Although the factor provided notice of the assignment to the university, the university continued paying the original vendor. The factor sued the university asserting that Ohio’s codification of Article 9’s provision governing discharge upon assignment—identical to Florida’s—required that the university pay it rather than the vendor. The university moved to dismiss on the grounds that Ohio’s codification of the government-transfer exception—also identical to Florida’s—precluded the factor’s claim. The trial court dismissed the action, and the intermediate appellate court affirmed. Id. at 760.
The Ohio Supreme Court also affirmed in favor of the university based on its interpretation of the term “transfer.” Id. at 762. It noted that the statute did hot define “transfer” and reasoned that it must therefore give that term its “common, everyday meaning.” Id. at 761. It consulted two dictionaries, which variously defined “transfer” as “[t]he conveyance or removal of something” from one person to another and “[a]ny mode of disposing of or parting with an asset ..., including the payment of money.” Id. (alterations in original). Applying those definitions, the court held that the government’s payment on an account receivable involves a transfer of money and was thus outside the' scope of Ohio’s analog to section 679.4061(1). Id.
Unsurprisingly, the Department argues that MP Star got it right, while United Capital says the opposite. Although we agree with MP Star on the basic principles of statutory interpretation that resolve the case—that we apply unambiguous statutory language as written, see Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984), and give undefined statutory terms their common, everyday meaning, see Am. Heritage Window Fashions, LLC v. Dep’t of Revenue, 191 So.3d 516, 520 (Fla. 2d DCA 2016)—we disagree that these principles lead to the conclusion that section 679.4061(1) is inoperative in circumstances where a governmental unit is merely the account debtor.
We think that MP Star’s interpretation of the statute, is incomplete. It construed only one word in the government-transfer exception—it held that the word “transfer” includes a payment of money— without regard to. the remaining text of *132 that section. See Am. Heritage Window Fashions, LLC, 191 So.3d at 521 (stating that statutory provisions must be construed as a whole). By its express terms, however, the government-transfer exception is implicated only in circumstances where Article 9 otherwise “applies to” a transfer by the government. § 679.1091(4)(n) (“This chapter does not apply to ... [a]ny transfer by ... a governmental unit.” (emphasis added)). That requires that we determine whether holding that section 679.4061(l)’s provisions regulating discharge of an obligation upon assignment of an account receivable are operative as against a governmental account debtor is to “apply” Article 9 to a government transfer. MP Star neither asked nor answered that question.
In everyday usage, section 679.1091(4)(n)’s provision that “[t]his chapter does not apply to .... [a]ny transfer ... by a governmental unit” is understood this way: “[t]his chapter” is the subject of the sentence; “does not apply” is the predicate verb phrase; and the noun phrase “[a]ny transfer ... by a governmental unit” is the object of that predicate. See Mark Lester & Larry Beason, The McGraw-Hill Handbook of English Grammar and Usage, 33 (2d ed. 2013). “This chapter” clearly encompasses all of section 679.4061(1). “[D]oes not apply to” then clearly restricts applying section 679.4061 to government transfers that would otherwise be included. We are left with addressing whether an account debt- or’s payments on accounts receivable in accord with section 679.4061 are transfers to which Article 9 is being applied. Put differently, the question is whether an account debtor’s payments on accounts receivable are objects of section 679.4061.
The text of section 679.1091—the statute that defines the scope of Article 9 and of which the government-transfer exception is a part—makes clear that the answer to that question is no. Section 679.1091(1) defines the scope of Article 9—i.e., it defines the things to which Article 9 applies. As relevant here, that subsection states that “[tjhis chapter applies to ... a sale of accounts, chattel paper, payment intangibles, or promissory notes.” § 679.1091(l)(c) (emphasis added). Although the statute unambiguously says that it applies to sales of accounts like Arbor One’s sale of accounts receivable to United Capital, it does not say that Article 9 applies to money or transactions in money as such, like the Department’s transfer of money to discharge its contractual obligation on an account. In other words, the plain terms of section 679.1091(1) establish that Article 9 does not apply as an initial matter to the transfer of money involved when an account debtor pays on an account receivable in order to discharge its contractual obligation to make that payment.
Because transfers of money to pay accounts receivable are not within the defined scope of Article 9—i.e., are not something to which Article 9 applies—the government-transfer exception cannot be deemed to exclude that transfer from a scope of operation to which it never belonged. Section 679.1091(1) states that the items it lists are within the scope of Article 9 “except as otherwise provided in subsections (3) and (4).” (Emphasis added.) That necessarily means that the exceptions stated in section 679.1091(4), which include the government-transfer exception, are items to which Article 9 would have applied had the legislature not removed them from its scope. Transfers of money to make payment on an account, chattel paper, or payment intangible—as distinguished from the sales of such assets themselves—are not something to which Article 9 applies as an initial matter. See § 679.1091(1). As a result, we can only *133 interpret section 679.4061(l)’s regulation of an account debtor’s obligations upon assignment of an account, chattel paper, or payment intangible as applying to the transfer of the asset itself (here, the sale of the accounts receivable by Arbor One to United Capital), which is within the scope of Article. 9, and not as applying to the transfer of money involved in discharging the account debtor’s contractual obligation to make payments on that account, chattel paper, or payment intangible (here, the Department’s payments on accounts receivable), which is not.
This interpretation is confírméd by the text of section 679.4061, which governs sales of accounts, chattel paper, and payment intangibles and contains the discharge-upon-assignment provision to which the Department objects. Section 679.4061 invalidates restrictions on sales of those assets, specifies the various parties involved in such sales, and defines their rights and obligations vis-á-vis each other. As implicated here, it identifies the person to wl]om an account debtor owes performance both before and after the sale and directs performance to that person in order for the account debtor’s obligation to be discharged. § 679.4061(1) (“After receipt of the notification, the account debtor may discharge its obligation .... ”). To be sure, the manner in which an account debt- or discharges its obligation is by paying the money it owes on the account, chattel paper, or payment intangible, which MP Star regards as a type of transfer. But defining a transfer to include a payment does not mean that the payment is the transfer to which the statute applies. On the contrary, the statutory text shows that the transfer to which the statute applies— the transfer that is the object of the statute—is a transfer of accounts, chattel paper, or payment intangibles, not a transfer of money as payment- to satisfy an account debtor’s obligation on one of those items.
In sum, then, the government-transfer exception created by section 679.1091(4)(n), by its own terms, is not implicated by the mere fact that the government happens to be an account debtor required to make a payment on an account, chattel paper, or payment intangible that has been assigned. If a government actor sold such assets, that would be a different story. Article 9 generally applies to such sales, and the sale of an account, chattel paper, or payment intangible by a governmental body would be a transfer of that asset, which would be a transfer by a governmental unit within the meaning of section 679.1091(4)(n). That circumstance, however, is not what the facts of this case present. Here, the accounts receivable were sold by Arbor One to United Capital, and the Department, as the governmental account debtor, was owed notice of the sale under the statute for the purpose of sending the same payments it always owed. The text of section 679.4061 shows that its object—the thing it applies to—is the assignment of accounts, chattel paper, and payment intangibles. In this case, that occurred through a sale of accounts receivable, by a nongovernmental entity, not the payment on those accounts by a governmental one.
B.
The Department contends that even if it is governed by section 679.4061(1), sovereign immunity affords it a complete defense to United Capital’s claims. It argues that sovereign immunity prevents it from becoming obligated to pay United Capital, notwithstanding Arbor One’s assignment of accounts to United Capital, because it never entered into a contract with United Capital. We disagree and hold that the Department, having entered into a contract with Arbor One, was bound by the rules governing assignment of Arbor One’s *134 express contract rights in the same way that any other contracting party would have been bound.
Sovereign immunity affords the government a privilege not to be sued without its consent. See City of Ft. Lauderdale v. Israel, 178 So.3d 444, 446 (Fla. 4th DCA 2015). Our constitution allows the legislature to waive that immunity by general law. Art. 10, § 13, Fla. Const. Here, the legislature has by general law waived the Department’s immunity on contract claims:
Suits at law and in equity may be brought and maintained by and against the department on any contract claim arising from breach of an express provision or an implied covenant of a written agreement .... In any such suit, the department and the contractor shall have all of the same rights and obligations as a private person under a like contract ....
§ 337.19(1), Fla. Stat. (2012). The question is whether a claim by an assignee of contractual accounts receivable—here, United Capital—based on the Department’s failure to payas required by the contract falls outside of this waiver. We think that it does not.
The supreme court discussed the doctrinal basis for sovereign immunity waivers in contract cases in Pan-Am Tobacco Corp. v. Department of Corrections, 471 So.2d 4 (Fla. 1984). There, a vendor to the Department of Corrections (DOC) sued for breach of contract, seeking lost profits as damages'. The trial court granted summary judgment to DOC baséd on sovereign immunity, holding that the- legislature had not adopted a statute authorizing contract suits against it. The First District affirmed and certified a question as to whether sovereign immunity bars a claim for breach of contract by a private vendor who has suffered -lost profits against a- state agency. 1⅛ at 5. .
The supreme court answered that question in the negative and quashed the First District’s decision. Id It reasoned that although the legislature had not explicitly waived sovereign immunity for contract claims against DOC, it had by general law both empowered it to enter into contracts and also authorized certain activities'that required it to have the power to contract. Id. It explained that if sovereign immunity barred a contract claim against DOC, the contracts it entered would be invalid and unenforceable in circumstances where the legislature, by authorizing DOC to enter into those contracts, plainly contemplated that the contracts should be valid and enforceable. Id The codrt thus held that “where the state has entered into a contract fairly authorized by . general law, the defense of sovereign immunity will not protect the state from action arising from the state’s breach of the contract.” Id
A necessary implication of Pan-Am’s sovereign immunity analysis is that, unless, the legislature has specified that different standards apply, the government’s obligations under the terms of an express written contract it was authorized by law to enter are subject to the same standards of contract performance and enforcement that would apply to a private party. See also Chiles v. United Faculty of Fla., 615 So.2d 671, 679 (Fla. 1993) (Shaw, J., concurring in part and dissenting in part) (“Once the State enters the arena of formal contracts, it waives any right to special treatment when it reneges on its promises”). Pan-Am hinges on the notion that when the legislature authorizes the government to make a contract, it intends for the contract to be performed and for nonperformance to be enforceable in a civil action against the government. 471 So.2d at 5. An established body of common law *135 and statutory rules governing contracts serves that function. Without that law or a legislative alternative to it, the perform-anee and enforcement of contracts to which the government is a party would at best be indeterminate and thus contrary to the statutory authorization allowing the government to make contracts in the first place. As such, where the government has entered into an express written contract that it is statutorily authorized to enter, sovereign immunity cannot protect it from thé same contract rules that govern the performance of the express written contract obligations of a private party to a contract.
Since Pan-Am, Florida courts have regularly considered sovereign immunity defenses in contract suits consistent with the notion that the government is subject to the same terms of contract performance and enforcement as a private party. For example, the supreme court has recognized that, like a private party, the government can be held liable for its breach of covenants that are implied by law into “Virtually every contract.” Cty. of Brevard v. Miorelli Eng’g, Inc., 703 So.2d 1049, 1050 (Fla. 1997) (quoting Champagne-Webber, Inc. v. City of Fort Lauderdale, 519 So.2d 696, 697-98 (Fla. 4th DCA 1988)). It has also , held that the government is liable .for prejudgment interest in a breach of contract action in the same way that a private party is. Broward Cty. v. Finlayson, 555 So.2d 1211, 1213 (Fla. 1990). And, most relevant to the facts of this case, in Kohl v. Blue Cross & Blue Shield of Florida, 988 So.2d 654, 659 (Fla. 4th DCA 2008), the Fourth District relied on Ban-Am to hold that sovereign immunity did not protect the State from a contract claim based on allegations that a state-run health insurer continued paying medical benefits directly to patients after being informed that the patients had assigned their contractual rights to those payments to the doctor who had provided the medical, services to them.
The same .result applies in this case. Section 679.4061(1)⅛ provision governing discharge upon assignment establishes a rule of contract performance: it determines how a party to a contract may discharge an obligation to make payment on an account created by virtue of that contract—i.e., how it can perform its contractual obligation to pay—after the party has been notified the account has been assigned. Cf. Bldg. Materials Corp., 972 So.2d at 1092 (applying section 679.4061(1) in the context-of a claim for'breach of contract). The 'Department all but concedes that this rule would govern in a contract dispute between private parties. For the reasons we have explained, the rule governs here as well. See also Mooney v. Univ. Sys. of Md., 178 Md.App. 637, 943 A.2d 108, 110-12 (2008) (holding that sovereign immunity did not protect state agency from liability based on failure to pay assignee of contractual account receivable), reversed on other grounds, 407 Md. 390, 966 A.2d 418 (2009).
The Department relies on cases like Israel, 178 So.3d 444, and City of Orlando v. West Orange Country Club, Inc., 9 So.3d 1268 (Fla. 5th DCA 2009), to argue that sovereign immunity prevents it from having to pay United Capital.[4] Those cases are inapposite. In each ease the Department cites, a party sought to compel a government agency to perform an obligation that *136 was not stated in an express written contract. Since Pan-Am and, as applicable here, section 337.19(1) waive sovereign immunity only as to an express written contract, sovereign immunity bars an action to enforce obligations not contained in such a contract. See Israel, 178 So.3d at 447; West Orange Country Club, 9 So.3d at 1272-73. But those are not the circumstances of this case. The Department’s written contract expressly requires the Department to pay for the services Arbor One rendered, and sovereign immunity does not protect the Department.
III.
In sum, we hold that the government-transfer exception in. Article 9 of the UCC does not exempt a government agency in its role as account debtor from the discharge upon assignment provision of section 679.4061(1). We. further hold that assuming that the other requirements of section 679.4061(1) have been satisfied, where a government agency enters into an authorized and express written contract containing a payment obligation, sovereign immunity does not protect the agency from a claim by the assignee of contractual accounts receivable for failure to pay. Finding ho merit in the Department’s remaining arguments, we affirm the trial court’s final summary judgment.
Affirmed.
CASANUEVA and WALLACE, JJ., Concur.

. The Department also asserts that the trial court erred by denying its motion to transfer venue, denying its motion to dismiss in favor of arbitration, and in granting summary judgment because United Capital had not complied with conditions precedent to suit. Without further comment, we find no merit in these issues.

. We note that even if section 67.9.4061(1) does not govern the manner in which the Department discharges its payment obligation after an assignment, it is quite possible that ordinary contract law would command the same result. See generally Restatement (Second) of .Contracts, § 338(1) (Am, Law Inst. 1977). Although the briefs allude to this possibility, the argument was not developed either in the trial court or here. Accordingly, we decline to address it.

. United Capital does not dispute, and we agree, that the Department is a "governmental unit” within the meaning of section 679,’1091(4)(n). See § 679.1021(1)(ss) (defining "governmental unit” to include “a department ... of ... a state”).

. The Department also notes that its contract with Arbor One contained an antiassignment clause, The' clause appears to be contained in ’' certain standard contract specifications developed by the Department. We agree with United Capital that the Department on our record fails to establish that these standard specifications applied to its roadside maintenance contracts with Arbor One.